**EMERSON ELECTRIC COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1414.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 18, 1977.

Decided April 6, 1978.

Thomas M. Hanna, St. Louis, Mo., for petitioner.

Christopher W. Katzenbach, Atty., N. L. R. B., Washington, D. C., for respondent; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Attys., N. L. R. B., Washington, D. C., on brief.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and HUNTER, District Judge.*

GIBSON, Chief Judge.

Emerson Electric Company petitions to review and set aside an order of the National Labor Relations Board (Board) entered on April 7, 1977. The Board has cross-applied for enforcement of its order.[1]

This case arises out of events occurring during and following an organizational campaign conducted by Local 574, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) at the company's Kennett, Missouri, plant. Emerson engages in the manufacture, sale and distribution of electrical appliances and related products at the Kennett plant and at various other locations. An organizational campaign on behalf of the Union was commenced in September 1975. This campaign culminated in a Board-conducted election on November 13, 1975, which the Union lost. There had been previous union campaigns at the Kennett plant in 1964, 1965, 1967 and 1973.

The Board found that during the period immediately prior to the November 13, 1975, election, Emerson committed several independent violations of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by creating the impression of surveillance, confining an employee to his work station, reducing employee clean-up time to prevent union discussion and threatening employees with discharge, plant shutdown and loss of benefits in the event the Kennett plant were unionized. Additionally, the Board found that Emerson had violated §§ 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1), by transferring employee Jimmy Smith to a less desirable job because of his union activity and by discharging employee Jerry "Redbird" Floyd because of his union activity.[2]

Upon a careful consideration of the record as a whole and of the briefs and arguments of the parties, we have concluded that, except for the provisions concerning the discharge of Jerry Floyd and the restriction of his gadding about the plant, the Board's order is supported by substantial evidence; that no error of law appears; and that further discussion would be without precedential value. We will discuss the Board's determinations that unfair labor practices occurred when Jerry Floyd was

---

* The Honorable Elmo B. Hunter, United States District Judge, Western District of Missouri, sitting by designation.

1. The Board's decision and order are reported at 228 N.L.R.B. No. 162 (1977). With one minor exception, which will be discussed below, the Board adopted the recommended order of the administrative law judge who conducted the hearing in this case.

2. The Board's order requires Emerson to cease and desist from engaging in the unfair labor practices found and from in any other manner interfering with employees in the exercise of their rights under the Act. Affirmatively, the Board's order requires Emerson to offer Smith and Floyd immediate and full reinstatement to their former jobs, to make them whole for any loss of earnings they may have incurred by reason of Emerson's unlawful actions and to post appropriate notices.

temporarily restricted to his work station and subsequently discharged, as there is scant evidence supportive of these findings and substantial evidence to the contrary.

The record is full of uncontradicted evidence that Floyd, a sample motor builder, habitually spent considerable amounts of time meandering around the plant collecting parts for his sample motors and chatting with other employees. Fishing, stag movies and "girlie" magazines were his favorite topics of conversation. Floyd's peripatetic conversations were a source of concern to foremen in other departments, who complained about his unrestricted activities. Floyd, moreover, on at least one occasion, simply refused to break off a particularly interesting fishing discussion despite directions to do so from supervisory personnel.

■ In the fall of 1975, Floyd was restricted to his work station during working time. Floyd was, at that time, the only sample motor builder at the plant. He was told that he was spending too much time away from his work station and was directed to concentrate his efforts on building sample motors. A change in supervisory personnel in the Quality Control Department took place in November 1975. Thereafter, there was no subforeman available to "run parts" for Floyd, who was accordingly allowed to leave his work station to collect parts. The Board found that Floyd's confinement to his work station constituted the denial of a previously enjoyed benefit because of his union activities.

We do not believe that the record, considered as a whole, contains substantial evidence supportive of this finding. Emerson had good cause to restrict Floyd to his work station during working time; it was aware that Floyd's conversational wanderings about the plant were detrimental both to his job performance and to that of employees in other departments. Moreover, the lifting of this restriction was a function of a change in supervisory personnel, which was merely coincidental with the union election. This coincidence does not suffice to transform a justified effort to increase employee efficiency into an unfair labor practice. Nor does union support grant carte blanche privileges to an employee to roam about the plant to indulge his fancy in visiting, gossiping and interrupting other workers during work hours.

■ The record is replete with evidence that Floyd was an employee with a history of consistently poor work performance and that his discharge was precipitated by an episode in which a particularly blatant act of carelessness on his part resulted in damage to company property and necessitated the temporary shutdown of a production line outside his department, with a consequent loss of incentive pay to other employees.

At the time of his discharge, Floyd was a sample motor builder. Sample motors are prototypes especially constructed to fit customer applications. They are produced either individually or in small lots, and their performance during customer testing is often determinative of future sales.[3] Thus, defectively constructed sample motors may have deleterious effects upon sales. Since 1972, sample motors for Emerson have been assembled at the Kennett plant by Quality Control Department employees known as sample motor builders. Since January 1973, sample motors have been subject to an audit procedure whereby defects in production are classified as either "critical" or "major" and so recorded.[4]

The Kennett plant's employees, including sample motor builders, are covered by a

---

**3.** According to the record, General Electric, one of Emerson's competitors in the electric motor field, estimates each sample motor results in 20,000 new motor sales over a three-year period; Emerson considers this figure compatible with its experience in its sample motor program.

**4.** A critical defect is one that will be expected to cause a motor failure prior to the expiration of the warranty, which is usually 25% of the estimated life of the motor. A major defect is one which might cause a motor to fail prior to the expiration of the warranty period. Minor defects which would not affect the performance of a motor are not recorded.

three-step disciplinary procedure consisting of (1) oral reprimand, (2) written reprimand and (3) suspension and/or discharge. Pursuant to this policy, an employee is to be suspended or discharged if he or she receives a third reprimand within twelve months of having received a second reprimand. If the twelve-month period following a reprimand passes without further reprimand, an employee's disciplinary record will be expunged.

Floyd, who had been employed at Kennett since 1966, bid into the sample motor builder job in 1973. He held the position of sample motor builder from July 7, 1973, until his discharge on January 8, 1976. Abundant mistakes attended Floyd's sample motor building tenure from beginning to end. The first official recognition of Floyd's negligent performance occurred on May 8, 1974, when Jewel Causey, then the first supervisor in the Quality Control Department, gave Floyd an oral reprimand for the poor quality of his work. Prior to issuing this reprimand, Causey had spoken to Floyd on several occasions about Floyd's failure to check parts and specifications before submitting sample motors for testing. Floyd's performance did not improve, and on October 4, 1974, he received a second-step written reprimand from Causey for his continuing mistakes and failure to check specifications before submitting motors for testing.

It is noteworthy that during this period, a friend of Floyd's, Rodney Bryant, was responsible for testing sample motors. Bryant did not write up all of the defects he found in Floyd's motors. Moreover, Bryant allowed Floyd to perform repairs of sample motors in the audit booth, in contravention of company rules, because he was aware of Floyd's touchy disciplinary situation and did not wish to be responsible for Floyd's termination. Thus, Causey's extreme dissatisfaction with Floyd's work, which resulted in the issuance of two reprimands within a short period of time, was based on an inaccurate record of the actual extent of Floyd's mistakes.

Jerry Hicks replaced Causey as supervisor in mid-January 1975. Floyd's careless performance of his job continued, and Hicks urged him on numerous occasions to pay more attention to blueprints and bills of materials. In late April 1975, Hicks found that Floyd had built a sample motor using the wrong protector, a mistake which could have been avoided by a simple comparison of part numbers against the bill of materials. As a result of this mistake, Hicks issued an oral reprimand to Floyd on April 25, 1975. This was Floyd's third reprimand within less than one year and, had the company's three-step disciplinary procedure been properly invoked, Floyd would have been subject to suspension or discharge. Because Hicks had not checked Floyd's personnel folder prior to issuing the oral reprimand, he was unaware that this was Floyd's third rather than first reprimand. Hicks's oversight was discovered some two to three weeks after the oral reprimand had been given. At this point, Emerson decided that it would be inappropriate to discharge Floyd. Floyd was called into the office of Ed Lee, Quality Control Manager, apprised of the managerial error in assessing discipline and told to consider the April 25 reprimand a second-step written reprimand. Lee, who was a friend of Floyd's to the extent that they shared stag films and "girlie" magazines, told Floyd that one more reprimand would mean discharge. He suggested that Floyd exercise his seniority to bid out of the department and, thus, avoid discharge. Floyd, however, chose to remain a sample motor builder.

Subsequently, various changes in personnel occurred in the Quality Control Department. In May 1975, Larry Greene, who was acquainted with Floyd and aware of his precarious disciplinary situation, became a sample motor auditor. Just as his predecessor Bryant had, Greene allowed Floyd to come in to the audit booth to correct mistakes and did not make a practice of writing up all of the defects found in Floyd's motors. Indeed, it appears that Greene wrote up only those defects found in Floyd's motors which were so serious that they could not be ignored. In mid-Novem-

ber, James Cooper became assistant foreman of the Quality Control Department. Cooper noticed a disparity between the number of defects he had observed in Floyd's motors and the number of defects written up on Floyd. He also became aware that Floyd was allowed to rework his motors in the audit booth. In mid-December 1975, Cooper requested that the departmental foreman in charge of auditors take steps to ensure that auditors wrote up defects accurately. The foreman instructed auditors to "call it like they saw it." A noticeable increase in write-ups on Floyd's motors followed immediately. While Floyd had had only twelve defects during the period from May 2, 1975, until November 21, 1975, he received thirteen write-ups between November 21, 1975, and December 26, 1975.

On December 29, 1975, Floyd made a mistake with immediate ramifications beyond the Quality Control Department and which precipitated his discharge. On that date, Floyd borrowed an hydraulic press from the Salvage Department at the plant to press a stator out of a motor shell. He did not check the ring on the press, which was the wrong size for the job he was attempting. His misuse of the press smashed the wiring of the stator,·rendering it useless and necessitating the winding of a new stator. Ordinarily, when rewinding of a stator was necessary, a subforeman would do so on the following morning, prior to the beginning of the regular day shift. The stator damaged by Floyd was, however, a "hot stator" which would be needed that evening.[5] Accordingly, the stator had to be rewound on the same day that it had been damaged, at another production line, which required the shutdown of normal production on that line for approximately one hour. During this time, the employees on that line lost incentive pay.

The General Foreman of the Winding Department, Eddie Cross, demanded that Floyd be written up for his error. Follow-

ing the New Year's holidays, managerial personnel held a meeting to determine the appropriate discipline for Floyd. They decided that, in light of Floyd's poor work record, discharge was the proper step under Emerson's three-step disciplinary procedure. Emerson subsequently discharged Floyd.

Floyd was an active Union supporter during the 1975 organizational campaign, as he had been during the preceding 1973 campaign, and Emerson was, in both instances, aware of his union proclivities. The Board held that Floyd was discharged because of his pro-Union activities in 1975. It rejected, as pretextual, Emerson's reliance on Floyd's history of poor work performance and the December 29, 1975, damaged stator incident as the bases for its decision to discharge him.

We do not believe that the record, considered as a whole, contains substantial evidence supportive of the Board's findings on Floyd's discharge. We have detailed a mere portion of the evidence indicative of Floyd's negligent performance of the duties of sample motor builder. The Board considered this monumental body of evidence a pretextual basis for discharge, simply because Floyd supported the Union during the 1975 campaign. While the record clearly indicates that Floyd promoted the Union and that Emerson was aware of his position, it does not support the inference that Floyd was discharged because of his union activity. Such an inference would transform the union mantle into an insurance policy against discharge for poor, substandard or sloppy work. The purposes of the National Labor Relations Act are to protect workers in their rights to organize and associate, and to promote better relations between management and labor. The Act's purpose is not to foist careless and inefficient workers on the national economy.

■ Union activity by an employee does not insulate him from discharge where his

---

5. A "hot" stator is a sample on which the plant has exceeded an allotted five days for produc-

tion and shipping, or a sample with the shipping date specified.

conduct so warrants.[6] *NLRB v. Cleveland Pressed Products Corp.*, 493 F.2d 1250 (6th Cir. 1974). "Where the reasons advanced for discharge are persuasive and serve as a plausible motive, the mere existence of the employee's union activity cannot serve as the real motive behind the employer's action." [7] *H. L. Meyer Co. v. NLRB*, 426 F.2d 1090, 1094 (8th Cir. 1970). Emerson relied upon Floyd's history of negligent performance, culminating in the December 29, 1975, episode, as the basis for his discharge. The grounds cited by Emerson for discharge are persuasive. The circumstances surrounding the discharge are both corroborative of the propriety of Emerson's motive and unsupportive of an inference of improper motive.[8]

We conclude that substantial evidence on the record considered as a whole does not support the Board's findings that Floyd was discharged because of his union activity during the 1975 organizational campaign and that he was unlawfully restricted to his work area. Accordingly, we deny enforcement of the Board's order insofar as it directs Emerson to reinstate Jerry Floyd and not restrict him to his work area, to

make him whole and to expunge the January 8, 1976, reprimand from his record. The remainder of the Board's order shall be enforced.

6. We note that the situation here included a cover-up by Floyd's buddies which delayed a discharge that was merited long before the actual facts came to the attention of supervisory personnel. Moreover, it is obvious that Emerson has been reluctant to discharge employees. The record indicates that only one employee other than Floyd has been discharged, although the record is unclear as to the period to which this low discharge rate applies. This practice belies the credibility of the rumor cited by the Board to the effect that Emerson was going to get rid of union pushers after the election. Only one union advocate was discharged and that for good cause wholly unrelated to his union advocacy. The Board ultimately seeks to penalize Emerson because of its reluctance to discharge employees by holding that it could not even discharge a patently substandard employee who was grossly indifferent to his job performance. Careless and unproductive employees are not entitled to any special protection because they wrap themselves in a union mantle.

7. Floyd's view of this issue casts an interesting sidelight on his generally indifferent job performance. He bragged to auditors that his union activity would immunize him from discharge. Moreover, he shrugged off an admonishment that he risked another reprimand if he did not check his work more closely with the

response that the company could do nothing to him because he would put the NLRB "on their ass." Why the NLRB should promote and encourage this type of misperformance is difficult to perceive.

8. It is noteworthy that one of the administrative law judge's main reasons for rejecting as pretextual Emerson's reliance on Floyd's performance was his finding that, in December 1975, Emerson had changed the method of reporting defects in such a way that the number of defects found in Floyd's work after the change gave a misleading impression as to the quality of his work. The administrative law judge found that prior to December 1975, no matter how many defects occurred in any one motor, they were counted as only one major or critical defect; after December 1975, however, each defect was listed separately. The Board rejected the administrative law judge's finding that Emerson had changed its method of recording defects and held that, to the contrary, even prior to December 1975, the defects in a single motor were listed separately. Thus, the number of defects written up on Floyd's motors in December was an accurate indicator of the quality of his work and was probative of both his poor performance and Emerson's awareness thereof.